UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PRECIMED INC. d/b/a Greatbatch Medical,

                        Plaintiff,

                                                    **REPORT AND**
                                                    **RECOMMENDATION**

             v.

                                                    13-CV-761A

ECA MEDICAL INSTRUMENTS,

                        Defendant.

## I.    INTRODUCTION

Pending before the Court are three consolidated motions (Dkt. No. 16) by

plaintiff Precimed Inc. ("Precimed" or "Greatbatch") for three different categories

of relief.  Precimed seeks a declaratory judgment, under 28 U.S.C. § 2201 and

Rule 57 of the Federal Rules of Civil Procedure ("FRCP"), that the Exclusive

Distribution Agreement (the "Agreement") that the parties entered on January 3,

2012 includes custom products and pricing for those products.  Precimed seeks

dismissal of defendant ECA Medical Instruments's ("ECA") third through sixth

counterclaims under Rule 12(b)(6); Precimed asserts that these counterclaims

duplicate the breach of contract counterclaim and are barred by the

comprehensive nature of the Agreement.  Finally, and under Rule 12(f), Precimed

wants certain language stricken from ECA's counterclaims—language pertaining

to prior litigation and Precimed's alleged financial state that Precimed considers

irrelevant and inflammatory.

ECA opposes each of Precimed's motions.  ECA argues that the Agreement defines standard and custom products separately and does not contemplate custom products within the marketing framework setup for standard products.  ECA opposes deletion of any language from its counterclaims because the language helps establish Precimed's history of poor contractual conduct and motive for breaching the Agreement.  Finally, ECA asserts that its various tort-based counterclaims are valid as long as the Agreement does not cover custom products.

The Court held oral argument on December 19, 2013.  On January 24, 2014, the Court received supplemental briefing from the parties in response to an order that the Court issued posing them additional questions.  (Dkt. No. 24.) Specifically, the Court has received and has carefully considered the following items and thanks the parties for providing them: Precimed's supplemental brief (Dkt. No. 26) and supplemental affidavits from Robert Moore (Dkt. No. 27), Douglas Slomski (Dkt. No. 28), and Robert Vento (Dkt. No. 29); and ECA's supplemental brief (Dkt. No. 25) and supplemental affidavit from James Schultz (Dkt. No. 30).

For the reasons below, the Court respectfully recommends 1) denying Precimed's motion for declaratory judgment; 2) granting Precimed's motion to dismiss ECA's third through sixth counterclaims; and 3) denying without prejudice Precimed's motion to strike.

2

## II.    BACKGROUND

This case concerns two medical equipment companies that are trying to blame each other for disappointing sales and sales commissions.  ECA manufactures motorized orthopedic surgery instruments, such as drills, screwdrivers, and bone saws.  Traditionally, manufacturers designed orthopedic surgery instruments for repeated use, but durable instruments are expensive and difficult to maintain.  To address the cost and difficulty of maintaining durable instruments, ECA developed surgical instruments consisting of multiple-use power bases to which surgeons could attached disposable saw blades, screwdriver heads, or other tools.  The new disposable instruments strike a balance between the strength necessary to carry out an operation and a low enough cost to justify disposal after one use.  As the supplemental materials demonstrate—and the Court will cite important background information without compromising sensitive information filed under seal—ECA's instruments come with standard technical specifications and a range of standard tips, colors, and etching options.  Customers, however, are not discouraged from proposing variations that go beyond the standard range of options for any given instrument.  "ECA Medical Instruments is also happy to discuss your custom torque limiting requirements.  We will walk you through our custom specification and development process that will be the highest velocity to market in the industry."  (Dkt. No. 29 at 6.)  Both sides acknowledge that sometimes, discussions and

3

efforts about a customization request did not require building a custom product from scratch; in those instances, ECA would use a standard product as a "baseline" and then work with the customer on deviations from that baseline.

Precimed also manufactures various medical instruments, but its manufacturing operations are not relevant to this case. Precimed's relevant operations consist of the marketing, sales, and distribution of medical instruments.

Precimed and ECA entered the Agreement on January 3, 2012 to benefit from each other's strengths. Precimed wanted a chance to sell ECA instruments to new and existing customers, given ECA's general reputation in the field and the novelty of disposable instrument technology. In turn, ECA wanted to tap into Precimed's marketing and sales expertise to expand the market for its disposable and other instruments. The Agreement (Dkt. No. 1-1) contains numerous provisions establishing a manufacturing and distributing relationship between the companies; the Court highlights those portions of the Agreement that bear on the pending motions:

1. Section 2.1 defines the term "Products" as follows: "The term 'Products' as set forth in this Agreement shall include those specific Single Procedure, Multiple Procedure Torque Limiting, Ratcheting and Fixed Surgical Devices, and Sterile Single Procedure Surgical Delivery Systems manufactured by [ECA] under one or more of its trademarks, all such surgical devices and delivery systems as more specifically set forth on Exhibit 'A' attached hereto, as it may be amended by the parties from time to time."

4

2.      Section 1.1 gives Precimed "the exclusive right to promote, market, distribute and sell the Products in the Territory in the field of orthopaedics (the 'Exclusive Field').  [Precimed] hereby accepts such exclusive appointment and agrees to use commercially reasonable efforts to promote, distribute, market, and sell the Products in the Territory during the Term, in accordance with the terms and conditions of this Agreement. Notwithstanding the foregoing, until January 1, 2012 [ECA] retains the right to sell the Products for specific pre-established accounts (a 'House Account') in the Territory and all such House Accounts and their products are listed on Exhibit B, and [ECA] retains the right to promote, market and advertise the Products in the Territory, and retains the right to promote, distribute, market and advertise, and sell similar products outside of the Exclusive Field in the Territory.  As of January 1, 2012, [ECA] will offer to transfer any or all of such House Accounts to [Precimed] and [Precimed] may, but need not accept, any or all of such transfers.  However, subject to the terms of this Agreement, [ECA] agrees to provide all future sales leads and opportunities in the Territory and Exclusive Field to [Precimed].

3.      Section 4.1 sets forth a procedure by which Precimed "shall submit purchase orders for the Products" to ECA.

4.      Section 4.2 sets forth an invoicing scheme for "each shipment of Product."

5.      Section 5.2 states that, unless Precimed agrees to other arrangements in writing, "all Products supplied under this Agreement will be manufactured in accordance with" various quality standards including those of the International Standards Organization ("ISO").

6.      Section 5.4 states that ECA promises not to make any "Substantive Change" to the specifications, processing, manufacturing, and other aspects of the Products without advance notice.  This section defines "Substantive Change" as "a change that would (i) affect registrations or approvals, (ii) affect the form, fit or function of the Product, (iii) alter any

clinical indication, contraindication or intended use of the Product, (iv) require a change of the Product configuration, (v) alter the production location, (vi) be visible to the end-user of the Product (and be material), including labeling, sterile packaging or instruction for use, or (vii) require a submission to a conformity assessment or regulatory body or authority."

7.　　Sections 5.5 and 5.6 require ECA to maintain compliance with the provisions of 21 C.F.R. § 820 "for each batch, lot, or unit" of Product manufactured.

8.　　Section 5.9 sets forth how Precimed and ECA will work together to handle any recall of "any product which incorporates the Product."

9.　　Section 5.10 establishes ECA as "the legal manufacturer of the Products" and gives ECA the responsibility for any regulatory registrations and approvals "as required by applicable laws in connection with the Products."

10.　　Section 6.1 requires Precimed to "use reasonable commercial efforts to promote, distribute, market and advertise, and sell the Products" within the defined sales territory.

11.　　Section 6.2 requires Precimed to maintain "a sufficient number of its own sales and service personnel who have adequate experience and ability to fulfill" its sales and marketing responsibilities.

12.　　Section 6.4 reads in its entirety as follows: "Each party may be requested from time to time to provide promotional and sales support for the Products to the other party, and in each case the non-requesting party shall use reasonable efforts to accommodate such requests.　All reasonable out-of-pocket expenses resulting from such requested promotional and sales support will be reimbursed fully by the requesting party.　The parties agree to participate in teleconferences or face-to-face meetings to discuss promotional, marketing and advertising, sales and operational plans for the previous period and the upcoming period (the 'Business Reviews'). The Business Reviews will be held monthly for the first six months after the

Effective Date and quarterly thereafter.  During the Business Reviews, both parties will discuss custom products that [Precimed's] customers have requested, competitive marketing information, new customer requirements, estimated sales forecasts, Product lead times, customer complaints and other information determined by both parties to facilitate effective execution of this Agreement."

13.    Section 7.1 sets forth minimum purchases of "Product available" that Precimed had to make from ECA during each of the first five years of the Agreement.

14.    Section 7.2 states that if Precimed failed to make the minimum purchases described in Section 7.1 then ECA would provide written notice of non-compliance.  Precimed then would have 30 days to catch up with minimum purchases or would forfeit the exclusive right to promote, distribute, market, advertise, and sell the Products into designated sales territory.  The catch-up requirement and the forfeiture of exclusivity rights "constitute [ECA's] sole and exclusive remedy and [Precimed's] sole obligation with respect to a breach of Section 7.1 by [Precimed]."

15.    Article 9 in general sets forth certain warranties regarding the Products, including warranties pertaining to defects, mislabeling, trademark infringement, regulatory compliance, and free and clear title.

16.    Section 14.1 states that "[t]his Agreement and all sales and commission transactions pursuant hereto shall be governed by the laws of Delaware, but without reference to the choice of law provisions thereof."

17.    Section 14.4 states that the written Agreement constitutes the entire agreement and understanding of the parties, and that the Agreement "may not be modified except in writing, signed by both of the parties hereto."

18.    Exhibit A to the Agreement consists of several pricing tables. One pricing table lists prices for customer samples, or sample instruments provided to prospective customers.  A note under

this table discloses that "Custom Designs will be quoted separately on an as needed basis." Two other tables, titled "Market Based Pricing Commitment" and "Volume Based Pricing Table," list market prices and profit margins for nine specific models of instruments that ECA manufactures. The next four tables list technical specifications for 15 models of instruments that ECA manufactures. On note under each table states as follows: "Features specified are standard for each model . . . . Deviation(s) from above standard features may effect [sic] unit cost." The last table in the Exhibit A is titled "Lead Times"; among other information, this table sets a lead time of 14 days for "Standard Production Lead Times," two weeks for "Standard Sample Lead Times," and four weeks for "Prototype Lead Times."

Although both sides acknowledged at oral argument that they continue to work with each other, tensions in the relationship appear to have arisen about a year after they entered the Agreement. According to ECA's counterclaims,[1] the parties met in November 2012 to discuss ECA's growing concern about Precimed's ability to fulfill its obligations under the Agreement. ECA's concerns included the inability of Precimed employees to understand ECA's products and to market them effectively, given Precimed's promises in the opening clauses of the Agreement that it possessed the necessary technical and commercial competence; and Precimed's inability to meet its sales projections and to make the minimum purchases required by Section 7.1 of the Agreement. Precimed changed personnel and practices after the meeting, but any improvements in

---

[1] As explained below, the Court deviates a little from the usual Rule 12(b)(6) posture and gives deference to the factual allegations in the *counterclaims*, since those are the allegations facing potential dismissal.

sales were modest and did not satisfy the ECA's concerns.  ECA subsequently

invoked Section 7.2 of the Agreement and gave Precimed 30 days to make the

necessary minimum purchases to avoid losing its exclusive distributor rights.

Precimed did not make the necessary minimum purchases but refused to

negotiate any non-exclusive distribution arrangement.  Meanwhile, the parties

began arguing over ECA's accusation that Precimed was trying to commandeer

ECA's customers and to sell those customers its own products without attempting

to sell ECA's products.  ECA accused Precimed of unreasonably asserting

exclusive control of certain "house accounts," or established customers, to its

detriment.  Precimed accused ECA of failing to turn over certain house accounts

that it had to provide under the Agreement.

Further tensions entered the parties' relationship in 2013.  The parties

describe the chronology a little differently, but throughout 2012 well into 2013,

they appear to have met frequently to fulfill Section 6.4 of the Agreement and to

discuss new sales opportunities.  Around March 2013, Precimed allegedly ended

the meetings.  According to ECA's supplemental briefing, ECA lost four

opportunities to sell custom products because of Precimed's handling of the

customers involved.  Precimed's supplemental materials, meanwhile, indicate

that ECA quoted and made custom samples for several different potential

customers, though the materials do not indicate the ultimate outcome of those

quotes.  Another major source of tension emerges quite starkly from the motion

9

papers and the supplemental materials—the broad and ambiguous use of the

terms "the Agreement" and "cover" when discussing whether "the Agreement

covers" custom products.  The motion papers and supplemental materials make

repeated references to whether "the Agreement" ever "covered" custom products

and whether ECA started behaving differently at some point about "coverage" of

custom products.  (*See, e.g.*, Dkt. No. 27 at 2 ("ECA Medical shared Greatbatch

Medical's view that the Agreement covers custom products in all respects."); *id.* at

5 ("Conversely, the terms of the Agreement do not cover modified standard or

custom single-procedure, torque-limiting instruments or procedural kits."); *id.* at

15 ("Turning to the issue of custom products, I disagree that they were never

intended to be covered under the agreement."); Dkt. No. 28 at 1–2 ("ECA

Medical's understanding—and my understanding—was that the Agreement

covered standard products as well as custom products similar to [] standard

products."); Dkt. No. 29 at 1 ("ECA Medical shared Greatbatch Medical's view

that the Agreement covers custom products."). )

The disagreements between the parties eventually led to the pending

litigation.  On July 23, 2013, Precimed filed a complaint against ECA with five

causes of action.  In the first cause of action, Precimed accused ECA of

breaching the Agreement with respect to the transfer of certain house accounts.

In the second cause of action, Precimed accused ECA of breaching the

Agreement by failing to provide all sales leads and opportunities required by the

Agreement and keeping them for itself instead.  In the third cause of action,

Precimed accused ECA of breaching the Agreement by refusing to treat custom

products as "Products" under Section 2.1 of the Agreement and consequently by

working directly with custom accounts to the detriment of Precimed's distributor

arrangement.  In the fourth cause of action, Precimed accused ECA of breaching

Section 7.2 of the Agreement by declaring a loss of exclusivity before the

expiration of the 30-day period to remedy any failure to make minimum

purchases.  In the fifth cause of action, Precimed asserted entitlement to a

declaratory judgment that, essentially, would ratify its first four causes of action.

Specifically, Precimed demanded a declaratory judgment that it is entitled to the

house accounts and sales leads in dispute; that custom products are "Products"

covered by the Agreement; and that its exclusivity rights have not yet expired.

On October 28, 2013, ECA filed an answer to the complaint (Dkt. No. 11) that

included six counterclaims.  In the first counterclaim, ECA accused Precimed of

breaching the Agreement in ways including a failure to use adequate staffing and

skill to manage its obligations under the Agreement; and a failure to make

minimum purchases required by the Agreement.  In the second counterclaim,

ECA demanded a declaratory judgment that custom and semi-custom products

are not "Products" as defined by Section 2.1 of the Agreement, and that Precimed

never had exclusivity rights regarding custom and semi-custom products while

losing exclusivity rights with respect to house accounts.  In the third counterclaim,

ECA accused Precimed of tortious interference with prospective economic advantage by promoting only its own products to ECA's house accounts without trying to sell ECA's products.  In the fourth counterclaim, ECA accused Precimed of unfair competition, again by using ECA's house accounts for its own benefit without trying to promote ECA's products.  In the fifth counterclaim, ECA accused Precimed of breaching an implied covenant of good faith and fair dealing through the conduct described in the first four causes of action.  In the sixth counterclaim, ECA accused Precimed of inducing reliance on Precimed's promises to manage ECA's accounts properly, thereby setting up a claim of promissory estoppel.

Precimed filed the pending motions on November 13, 2013 and seeks three categories of relief.  Precimed argues for a declaratory judgment that the Agreement covers custom products, citing the language in Section 6.4 and Exhibit A that refers to custom designs, prototypes, and deviations from standard features.  According to Precimed, the Agreement, like any contract, must be read as a whole, and if the Agreement refers to custom products then Precimed's relationship with ECA under the Agreement includes the treatment of custom products.  Next, Precimed demands under Rule 12(f) that the Court strike certain language from ECA's counterclaims as immaterial and inflammatory.  ECA's counterclaims include a background section titled, "Greatbatch's Financial Troubles," that accuses Precimed of having an "economic reality" that "has been quite different than portrayed by Greatbatch's rosy public statements."  (Dkt. No.

12

11 at 15.)  This section continues with a mention of manufacturing facilities that Precimed closed and a Precimed press release announcing the closings.  The counterclaims also refer to prior litigation against Precimed.  Precimed argues that the language in question serves no purpose beyond inflaming any reader of the public docket and any future juror who may become aware of the allegations. Finally, Precimed seeks dismissal of ECA's third through sixth counterclaims as barred by the Agreement itself.  Precimed's argument on this point mostly flows from its assertion that the Agreement is a comprehensive document that unambiguously defines the relationship between the parties.  From that assertion, Precimed argues that ECA's first counterclaim for breach of contract covers all of ECA's assertions, and that the tort claims in the third through sixth counterclaims are improper redundancies.

ECA opposes each of Precimed's arguments for relief.  ECA argues that the plain language of Sections 2.1, 6.4, Exhibit A, and other parts of the Agreement always treats custom products as a term or concept separate from the "Products" that are the focus of the Agreement.  The separate treatment of custom products, according to ECA, means not only that the definition of "Products" does not include custom products but also that more than one reasonable interpretation of the Agreement exists.  With more than one reasonable interpretation, declaratory judgment is not appropriate.  With respect to dismissal of counterclaims, ECA notes that Precimed's arguments for dismissal

require the prior conclusion that the Agreement is a comprehensive document that includes custom products. Without that prior conclusion, which ECA again argues is unfounded, the tort-based counterclaims are all properly pled. Finally, ECA argues against striking the language that Precimed finds offensive because it relates to Precimed's motives for allegedly violating the Agreement. ECA also asserts that the language in question rests on publicly available information and thus cannot prejudice current or potential customers in the ways that Precimed suggests.

In addition to all of the above background information, the Court notes two other pieces of information that emerged at oral argument. At oral argument, the Court called out ECA for omitting from its counterclaims and motion papers what actually happened in the prior litigation that it cited concerning Precimed. One case cited was *Zimmer Inc. v. Greatbatch LTD*, No. 12-CV-711, from the Northern District of Indiana. That complaint was filed in November 8, 2012. On December 17, 2012, the plaintiff withdrew its request for a preliminary injunction. On January 4, 2013, the parties filed a stipulation of dismissal with prejudice, which the court endorsed on January 9, 2013. The other case was *Medical Research Products A Inc. v. Wilson Greatbatch Ltd.*, No. 05-CV-3265, from the Central District of California. The plaintiff, MRPA, filed that case on May 2, 2005. On June 1, 2005, MRPA dismissed the case without prejudice under Rule 41(a), before it ever even served the complaint. In its counterclaims and motion papers,

ECA never mentions that these two cases supposedly probative of Precimed's

financial troubles and "predatory behavior" ended within 60 days of filing.

Nonetheless, ECA insisted at oral argument that the very acts of filing the

complaints and paying the filing fees are probative of its own allegations about

Precimed's financial troubles and "predatory behavior":

> MR. MADDIGAN:  Reason it's relevant is not, again, not so much for the substance of those allegations, but for the fact that they were engaged in active litigation.
>
> THE COURT:  We're all lawyers.  We're all lawyers. We know why we bring lawsuits, don't we?  They're not always related to something. You know, you and I can be involved in a lawsuit; that doesn't mean as to other business, things have changed.  Sometimes the lawsuit is what has to happen, right?  And sometimes they get settled because, well, there's really not as much of a dispute as we thought.  You know where I'm going.  It's no sense me trying—I'm not trying to be cute here, I'm just trying to tell you, so what the lawsuits?  Right?  I want you to answer that later.
>
> MR. MADDIGAN: Okay.

(Dkt. No. 24 at 7.)

The other piece of information that emerged at oral argument concerned

the state of the parties' relationship.  Despite the pending motion and the ongoing

litigation, the parties confirmed that they continue to do business with each other

to the extent that their disputes permit.

On December 27, 2013, the Court issued an order (Dkt. No. 24) calling for

supplemental briefing that addressed seven questions about the language of

certain parts of the Agreement and about the history of the parties' relationship

with respect to actual opportunities that may have arisen to sell custom products.

In response, ECA filed a supplemental memorandum of law (Dkt. No. 25) that

provided background information about the parties' relationship that helped put

the pending motions in context and confirmed the Court's initial assessment of

the situation.  Among other information, ECA clarified that, to the extent that it has

argued that "the Agreement" does not cover custom products, it meant that

Section 2.1 does not include custom products.  As for the Agreement as a whole,

ECA explained that the Agreement anticipates that opportunities to sell custom

products might arise and that Precimed might bring them to ECA's attention.

ECA had no obligation under the Agreement to proceed with any sales, but did

have an obligation to generate a custom quote in good faith.

## III.   DISCUSSION

### A.   *Motion for Declaratory Judgment*

The Court will address Precimed's motion for declaratory judgment first,

since the outcome of that motion would have the most significant impact on this

case and the relationship between the parties.  In addressing this motion and all

of Precimed's motions, the Court will apply federal procedural law with respect to

the standards for declaratory judgment and dismissal.  The Court will apply

Delaware law for both the interpretation of the Agreement and the substantive

elements of ECA's contractual and tort-based counterclaims.  Arguably, Section

14.1 could read as a narrow choice-of-law provision that selects Delaware law

16

only for the interpretation of the Agreement and breaches of it, with an explicit rejection of Delaware choice-of-law rules and an implicit gap that would leave tort claims to the law of the forum. *See, e.g., Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) ("Under New York law, in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties. In the case at hand, the choice-of-law provision in the parties' mortgage document stated only that '[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.' We see no way such language can be read broadly enough to apply to fraudulent misrepresentation.") (citation omitted); *Michele Pommier Models, Inc. v. Men Women NY Model Mgt., Inc.*, 14 F. Supp. 2d 331, 336 n.2 (S.D.N.Y. 1998) ("When no party discusses choice of law in a tortious interference claim, the parties are deemed to have acquiesced to the application of the law of the forum.") (citations omitted). The parties, however, have cited exclusively to Delaware law for all of their substantive arguments. At no time have the parties raised any question or dispute regarding choice of law. Accordingly, the Court deems the parties to have acquiesced to the use of Delaware law for all substantive issues, regardless of the exact scope of Section 14.1 of the Agreement. *Cf. Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001) ("The parties' briefs assume that New York substantive law

governs the issues of contract interpretation and statute of limitations presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law.") (citation omitted).

1.   *Standard for Declaratory Judgment*

The rules and principles governing declaratory judgments are well known. "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  28 U.S.C. § 2201(a).  Under FRCP 57, the procedure for obtaining a declaratory judgment follows the Federal Rules of Civil Procedure, which would include the pleading requirements of Rule 8.  Declaratory judgment is a remedy and not a cause of action or any right that otherwise would alter the substance of the case or any jurisdictional requirements.  *See Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406–07 (S.D.N.Y. 2010) ("Declaratory judgments and injunctions are remedies, not causes of action.") (citations omitted); *accord Bristol Village, Inc. v. Louisiana-Pacific Corp.*, 916 F. Supp. 2d 357, 369 (W.D.N.Y. 2013) (Skretny, *C.J.*) (citations omitted).  As a remedy, declaratory judgment serves to clarify where litigants stand in an ongoing relationship with each other, to prevent or to limit damages that are reasonably certain to occur.  *See Luckenbach S. S. Co. v.*

18

*U.S.*, 312 F.2d 545, 548 (2d Cir. 1963) ("The purpose of the declaratory remedy is to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage had accrued.")  (internal quotation marks and citation omitted); *see also In re Prudential Lines Inc.*, 158 F.3d 65, 70 (2d Cir. 1998) ("Where the contingent event upon which the controversy rests is unlikely to occur, the controversy lacks sufficient immediacy and reality to warrant declaratory relief.") (internal quotation marks and citation omitted).  Declaratory judgments should not address remote contingencies or damages tied exclusively to past events.  *See Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) ("To obtain *prospective* relief, such as a declaratory judgment . . . a plaintiff must demonstrate a 'certainly impending' future injury.  In establishing a certainly impending future injury, a plaintiff cannot rely solely on past injuries; rather, the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought.") (citations omitted).  Awarding declaratory judgment is a matter of discretion, *see Muller v. Olin Mathieson Chemical Corp.*, 404 F.2d 501, 505 (2d Cir. 1968) ("[E]ven when justiciability is present the court is not required to proceed with the declaratory judgment action, for it is well settled that a trial court's decision to exercise declaratory jurisdiction is a discretionary one.") (citation omitted), but the amount of discretion that courts have to refuse to issue a declaratory judgment seems

inversely proportional to the helpfulness of that judgment.  "The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.  It follows as a general corollary to this rule that if either of these objectives can be achieved the action should be entertained and the failure to do so is error."  *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969) (internal quotation marks and citation omitted); *accord Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992) ("If either prong is met, the action must be entertained.").

Here, regardless of what the Court's ultimate recommendation would have been, the parties have presented circumstances that make an analysis of declaratory judgment worthwhile.  The parties have confirmed that they have an ongoing relationship through the Agreement.  While Precimed has filed a motion to dismiss some of ECA's counterclaims, neither side is challenging the sufficiency of the other side's pleadings with respect to breach of contract.  Customer requests for custom products have arisen in the past and likely will arise in the future.  If the Court decides now how the Agreement treats custom products then the parties might reach an accord on the treatment of custom products that will stop lost sales, lost commissions, or other damages from

accruing each time a potential sale comes to their attention.  Since preventing

damages that will arise at the next request for custom products fits the purpose of

the declaratory judgment statute well, the Court will proceed to an assessment of

the merits of Precimed's motion for declaratory relief.

2.      *Does the Definition of "Products" in Section 2.1 of the*
        *Agreement Include Custom Products?*

The Court begins by reviewing the language of Section 2.1 of the

Agreement, which defines the term "Products."  Section 2.1 is central to every

argument that the parties have made regarding custom products, especially the

contentious issue between the parties about the use of the word "cover" when

arguing whether "the Agreement" "covers" custom products.  As the Court's

earlier excerpts show, every major provision in the Agreement that sets up the

relationship between the parties does so in the context of the Products.  The

introductory clauses of the Agreement confirm right away that the parties entered

the Agreement specifically because ECA wanted to sell the Products to

Precimed, who in turn wanted to distribute them.  Whether through plain

language, inference, or course of performance, if the definition of Products in

Section 2.1 does or does not include custom products then the party at the wrong

end of that interpretation will have a very difficult time finding another way to

oppose that interpretation.  A review of Section 2.1 thus is a good place to start.

In accordance with the *Erie* doctrine[2] and Section 14.1 of the Agreement, the Court turns to Delaware law for the applicable principles of contract construction.  "It is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract.  Only when there are ambiguities may a court look to collateral circumstances.  The language of the Agreement must therefore be the starting point."  *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992) (citations omitted).  "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.  Ambiguity does not exist where the court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.  Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.  The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."  *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (internal quotation marks and citations omitted).

--------------------

[2] *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

Here, a reasonable person in the position of the parties would discern only one meaning from the plain language of Section 2.1.  Section 2.1 states that the term Products "shall include" the specific list of products that the parties maintain in Exhibit A at any given time over the course of the Agreement.  In fact, Section 2.1 uses the word "specific" or "specifically" twice to emphasize that "Products" effectively equals "whatever the current list of products in Exhibit A is."  Exhibit A, in turn, consists of several tables with different information about samples, profit margins or commissions, volume pricing, and technical specifications.  Common to all of these tables is a list of discrete model numbers—for example, the Model 218 TLD Short Handle instrument.  The tables describe no other products.  As for customization, the notes that say, "Custom Designs will be quoted separately on an as needed basis" and "Features specified are standard for each model . . . . Deviation(s) from above standard features may effect [sic] unit cost" acknowledge that ECA has the ability to customize any of the discrete models that appear in the tables of Exhibit A.  In its supplemental briefing, ECA goes as far as to concede that it had an obligation to quote a custom product in good faith if Precimed brought a sales opportunity to its attention.  Customization, however, goes outside of the fixed pricing and specifications listed in the tables and requires separate treatment with respect to lead times, technical details, and pricing.  Precimed's supplemental materials confirm the parallel nature of ECA's

customization process, with its declaration that ECA "is *also* happy" to discuss

customization and that ECA "will walk you through our custom specification and

development process."  (Dkt. No. 29 at 6.)  There would be no need to discuss or

to walk through tables of standard specifications, standard variations, and

standard prices.

Meanwhile, the Court rejects Precimed's implicit all-or-none approach to its

use of the word "cover."  Precimed has argued repeatedly that, plain language

notwithstanding, Section 2.1 must include custom products because other

sections of the Agreement "cover" them, and because the Agreement is a

comprehensive and integrated document.  This argument is too categorical and

too simplistic; as ECA readily concedes, the Agreement is capable of

acknowledging the existence of custom products without putting them in Section

2.1.  As the Court has cited, Section 6.4 and the notes in Exhibit A obviously

mention custom products, but in a way that creates a parallel process to address

them case-by-case.  That parallel process has no impact on the extensive

process that the Agreement specifies for designing, regulating, and certifying

standard products, and then giving Precimed day-to-day authority to sell those

standard products right off of the tables in Exhibit A.  This is why the Court has

avoided, as much as possible, the ambiguous phrase "the Agreement covers,"

choosing instead to focus on the more precise question of whether Section 2.1

includes custom products.

In effect, then, ECA's end of the bargain in Section 2.1 amounts to taking a list of discrete, standard products and telling Precimed, "You have advance authorization to sell these model numbers, which we will call Products, at these prices.  If anyone wants a customized version of one of these model numbers then that's doable, but we'll have to work out each request one by one."  This understanding makes sense given other portions of the Agreement that concern regulatory compliance.  *Cf. Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*, 654 F. Supp. 1388, 1398 (D. Del. 1986) ("A contract should be interpreted as a whole.  Words used in one sense in one part of a contract are presumed to have been used in the same sense in another part of the same document.") (citations omitted).  Section 5.2 and its promise to comply with ISO requirements would be difficult to follow in the short term with a customized product.  Section 5.4 would make no sense, since any customization by definition would change the form, fit, or function of a model number and thus constitute a Substantive Change.  Sections 5.5, 5.6, and 5.10 again would be difficult to follow in the short term with a customized product since they require various efforts to ensure regulatory compliance.  Finally, Section 7.1 and its requirements for minimum purchases of Products would make no sense as applied to customized products, since neither Precimed nor ECA would know in advance when a customer wanted a customized product.  All of this information thus points to the

term Products in Section 2.1 meaning only the discrete model numbers listed in Exhibit A.

The only potential source of ambiguity in Section 2.1 does not carry enough weight to be a concern.  As the Court highlighted in its order for supplemental briefing, Section 2.1 uses the word "include" when defining the term Products.  The word "include" is more open-ended than words like "means" or "consists of."  *Cf. Radio Corp. of Am. v. Phila. Storage Battery Co.*, 6 A.2d 329, 336 (Del. 1939) (describing the phrase "may include" in a contract as "permissive, and in no sense mandatory"); *Schering Corp. v. Amgen Inc.*, 18 F. Supp. 2d 372, 382 (D. Del. 1998) (finding, in a patent case, that the phrase "consisting of" "indicates the claim is closed and no elements not recited may be included in the claim's definition") (citations omitted).  The examples, however, that follow the word "include" are specific in nature and, combined with the use of "specific" and "specifically," fill in the parties' intent to restrict Section 2.1 and Exhibit A to a specific list of model numbers.  *Cf. American Totalisator Co., Inc. v. Autotote Ltd.*, CIV. A. No. 7268, 1983 WL 21374, at *3 (Del. Ch. Aug. 18, 1983) (explaining, when interpreting a statutory definition, that words following the word "including" "are words in *pari materia* and should be helpful in understanding the parameters of what was intended").  The last clause of Section 2.1 allows the parties to amend Exhibit A "from time to time."  There is no history, however, of any changes that the parties actually have made, let alone made in writing as Section

26

14.4 requires. Nothing in the Section 2.1, therefore, interferes with the sole and objective interpretation of Section 2.1 as a provision defining Products as discrete and standard model numbers listed in Exhibit A.

        3.    *Can the Court Infer Inclusion of Custom Products in Section 2.1 of the Agreement?*

Having found a single, unambiguous interpretation of Section 2.1, the Court next will consider the possibility of an implicit inclusion of custom products in that section. As Precimed has argued, Exhibit A of the Agreement does mention custom products, however briefly, while Section 6.4 sets forth how the parties will meet periodically to discuss customer requests for custom products. Additionally, paragraph 71 in ECA's fifth counterclaim states that "the Parties anticipated that Greatbatch would develop opportunities to sell semi-custom and custom products in good faith." (Dkt. No. 11 at 27.) ECA's supplemental memo states further that the parties anticipated that sales opportunities for custom products would arise. Is there a chance, then, that the parties set up a means for discussing custom product requests, intended Section 2.1 to include custom products to further those means, but then forgot to make that intent explicit?

Delaware law again provides guidance. "The law will imply an agreement by the parties to contract and to do and perform those things which according to reason and justice they should do in order to carry out the purpose for which the contract is made. However, such promise can be implied only where it can be

27

rightfully assumed that it would have been made if attention had been directed to it.  A promise will not be read into a contract unless it arises by necessary implication from the provisions thereof.  Terms are to be implied in a contract not because they are reasonable but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to express them because they are too obvious to need expression. They are implied only because they are necessary to give the contract the effect which the parties as fair and reasonable men presumably would have agreed on, if, having in mind the possibilities of the situation which has arisen, they had contracted expressly in reference thereto."  *Danby v. Osteopathic Hosp. Ass'n of Del.*, 101 A.2d 308, 313–14 (Del. Ch. 1953) (citations omitted); *see also W & G Seaford Assocs., L.P. v. E. Shore Mkts., Inc.*, 714 F. Supp. 1336, 1346 (D. Del. 1989) ("Under the doctrine of necessary implication, a promise can be read into a contract in order to carry out the purpose for which the contract was made.") (citing *Danby*).

The Agreement here operates without any need to infer the inclusion of custom products in Section 2.1.  As explained earlier, the parties created a relationship through the Agreement that covered manufacturing standards, regulatory compliance, and fixed pricing, among other provisions.  The parties set up those provisions to handle a finite list of discrete model numbers of standard products that ECA makes.  The Agreement's provisions do not require the

inclusion of custom products for execution.  The few references to custom

products in the Agreement suffice to acknowledge that customers may request

customized products from time to time and that the parties will address those

requests as they arise.  While Precimed prefers to have custom products read

into Section 2.1, there is no logical or logistical gap in the Agreement that grinds

the parties' relationship to a halt unless Section 2.1 includes custom products.  In

fact, the parties have confirmed that they continue to work with each other for

standard products even as this dispute over custom products runs its course.

The parties' references to "baseline" products reinforces that they can sell

standard products without any impact from requests for customization.  Both

sides acknowledge that customization did not necessarily require building a

whole new product from scratch.  Sometimes, the parties could achieve

customization by picking a standard product close to a customer's request, using

that product's specifications as a "baseline," and then introducing deviations from

that baseline.  The process of deviating from a "baseline" could run its course

without ever affecting customers who simply wanted to buy a standard product off

of a list of model numbers and prices.  Under these circumstances, the Court

would reach too far to infer custom products as part of Section 2.1 and declines

to do so.  *Cf. Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, No.

C.A. 15388, 1997 WL 525873, at *5 (Del. Ch. Aug. 13, 1997) ("When the express

terms of the contract do not suggest the omission of such an obligation and the

implied obligation sought to be enforced conflicts with the express terms, the Court will not supply a term allegedly omitted.") (citation omitted).

  4. *Does the Parties' Course of Performance Indicate an Intent to Include Custom Products in Section 2.1 of the Agreement?*

So far, the Court has decided that the plain language of Section 2.1 unambiguously leaves custom products out of the definition of Products, and that the language of Section 2.1 and of the Agreement generally did not leave out any terms that have to be inferred.  The Court now must consider a final way by which Precimed could prevail, a way suggested by the parties' assertions about working with each other to accommodate requests for custom products.  Even if Section 2.1 and the Agreement generally contain no express or implied provision that includes custom products, could the parties have reformed the Agreement to include custom products through their course of performance?

Answering the above question requires looking at Delaware's Uniform Commercial Code (the "UCC"), Del. Code Ann. tit. 6 §§ 1-101 to 11-109 (Westlaw 2014).  The UCC covers the Agreement because the parties meet the definition of "merchant" in Section 2-104(1) and because the instruments in question fit the definition of "goods" in Section 2-105(1).  *See also* Section 2-102 ("Unless the context otherwise requires, this Article applies to transactions in goods . . . .") Section 1-303(a) of the UCC defines "course of performance" as "a sequence of conduct between the parties to a particular transaction that exists if: (1) The

agreement of the parties with respect to the transaction involves repeated

occasions for performance by a party; and (2) The other party, with knowledge of

the nature of the performance and opportunity for objection to it, accepts the

performance or acquiesces in it without objection."  Under Section 1-303(d),

evidence of course of performance "is relevant in ascertaining the meaning of the

parties' agreement, may give particular meaning to specific terms of the

agreement, and may supplement or qualify the terms of the agreement."  Section

1-303(f) allows evidence of course of performance to go as far as "to show a

waiver or modification of any term inconsistent with the course of performance."

Section 1-303(f) contains an important limitation, however: Evidence of a course

of performance must remain within the limits set by Section 2-209 of the UCC.

Section 2-209(2), in turn, requires that "[a] signed agreement which excludes

modification or rescission except by a signed writing cannot be otherwise

modified or rescinded . . . ."  *See also* Section 2-209 cmt. 3 ("Subsection (2)

permits the parties in effect to make their own Statute of Frauds as regards any

future modification of the contract by giving effect to a clause in a signed

agreement which expressly requires any modification to be by signed writing.");

*Betlin Mfg. Co. v. Prisco*, C.A. No. 1993-07-143, 1994 WL 1547773, at *2  (Del.

C.P. July 26, 1994) (mem) ("The parties hereto are merchants and the provision

of 6 Del. C. 2-209(2) requires that where the parties specify a method of

modification or rescission such method must be followed.").

31

The record here offers no information that would trigger the above sections of the UCC to rescue Precimed's interpretation of Section 2.1 of the Agreement. Through their motion papers, oral argument, and supplemental briefing, the parties have not demonstrated a course of performance that priced custom products using the tables listed in Exhibit A.  At most, Precimed has succeeded in demonstrating that, sometimes, a standard product and its standard pricing would serve as a "baseline" or point of departure for modifications that would satisfy a request for a custom product.  (*See, e.g.*, Dkt. No. 28 at 2 ("The Agreement's use of a list of standard products in Exhibit A was for the purpose of creating a baseline for ECA Medical to use for pricing product customizations.").)  Precimed uses this point to argue what the Court addressed above—that the Agreement "covers" custom products.  Ironically, though, the process of deviating from a baseline proves ECA's point about course of performance.  Even if the parties pegged custom specifications and custom prices to standards listed in Exhibit A, *the customization process always required separate discussions and separate negotiations that never happened with standard products*.  Buying a standard product required little more than finding the desired model number on a table, running a finger across the table to the unit price for that model number, filling out an order form, and writing a check.  In any event, Section 14.4 of the Agreement states explicitly that the Agreement "may not be modified except in writing, signed by both of the parties hereto."  That clause matches Section 2-209 of the UCC

almost verbatim, which means that Precimed cannot avail itself of any evidence of the parties' course of performance.  Section 2-209(4) does contain one limited exception that permits attempts at modification to demonstrate a waiver of contractual terms, but the parties have not submitted any information about their relationship that might qualify as an attempt that would set up a waiver.

In sum, the parties have not demonstrated a course of performance that adds custom products to Section 2.1, and Section 14.4 of the Agreement would supersede any course of performance anyway.  The Court thus rests on its interpretation of Section 2.1 of the Agreement as an unambiguous provision defining Products as the discrete and standard model numbers listed in Exhibit A.

### B.  *Motions to Dismiss*

As an initial matter, the Court will clarify what standard applies to Precimed's motion to dismiss ECA's counterclaims.  Briefly, the obverse of the familiar standard under Rule 12(b)(6) applies.  When addressing motions to dismiss plaintiffs' claims, courts proceed by "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citation omitted).  The acceptance of allegations carries the limitation that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citation omitted).  "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face.  A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.  The plausibility standard is not

akin to a 'probability requirement,' but it asks for more than a sheer possibility that

a defendant has acted unlawfully."  *Id.* (internal quotation marks and citations

omitted).  Here, these general principles remain true, except that the Court will

apply them to ECA's counterclaims, since the counterclaims are the allegations

that are under attack.  *Cf. D.S. Am. (East), Inc. v. Chromagrafx Imaging Sys.,*

*Inc.*, 873 F. Supp. 786, 792 (E.D.N.Y. 1995) ("Moreover, on a motion to dismiss,

all factual allegations of the complaint must be accepted as true and construed

favorably to the plaintiff.  These principles apply equally to a defendant's pleading

asserting counterclaims.") (citations omitted).

1.    *Third Counterclaim: Tortious Interference*

The Court first will consider ECA's third counterclaim, alleging tortious

interference.  In this counterclaim, ECA asserts that it had several house

accounts with major orthopedics manufacturers before entering the Agreement,

and that it turned these accounts over to Precimed as part of the Agreement.

Implicit in ECA's assertion is that ECA turned over these "lucrative accounts" in

the hope that Precimed could make them even more profitable than ECA already

had made them.  ECA then accuses Precimed of two kinds of interference.  ECA

states that Precimed "intentionally and wrongfully interfered with ECA Medical's

opportunity to make those sales [of ECA products] by promoting and selling its

own products instead."  (Dkt. No. 11 at 24.)  "At the same time, [Precimed's]

technically and commercially incompetent sales force damaged ECA Medical's

pre-existing opportunities to sell to these four OEMs."  (*Id.* at 25.)  Precimed

seeks dismissal of these accusations on the grounds that the Agreement creates

a comprehensive relationship between the parties with a full delineation of each

side's responsibilities.  According to Precimed, if the Agreement sets forth all of

its responsibilities then its alleged failure to fulfill those responsibilities falls under

a breach of contract claim, and bolstering that claim with a duplicative tort claim is

not allowed.  ECA, in response, fuses Precimed's argument into the argument

about custom products and asserts that the motion must fail because the

Agreement does not cover custom products.  ECA then argues that it has pled all

of the necessary elements for a claim of tortious interference.  Two facts are

critical to ECA's assertions and Precimed's motion to dismiss them.  First,

Precimed or people working in their capacity as Precimed employees directly

committed the alleged interference.  Second, Precimed's alleged failure to

promote ECA's products, to manage ECA's house accounts, and to pursue sales

opportunities for ECA as required by the Agreement are one and the same with

the alleged tortious interference.

In pursuing arguments about the elements of a tortious-interference claim and about the comprehensive nature of the Agreement, the parties have overlooked a more fundamental legal principle under Delaware law. "It is well settled that a party to a contract cannot be held liable for breaching the contract and for tortiously interfering with that contract. Thus, to state a claim for tortious interference with contract the complaint must contain factual allegations that support a reasonable inference that [defendants] were each a stranger to both the contract and the business relationship giving rise to and underpinning the contract." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 884 (Del. Ch. 2009) (internal quotation marks and citations omitted); *accord Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994) ("It is rudimentary that a party to a contract cannot be liable both for breach of that contract and for inducing that breach."). Here, according to ECA's first counterclaim, Precimed "breached by the Agreement in multiple ways, including among other things by failing to staff the ECA Medical account appropriately, by failing to act in a commercially and technically competent matter, and by failing to make the minimum purchases required by the Agreement." (Dkt. No. 11 at 23.) Though worded differently, the first and third counterclaims allege the same conduct: Precimed did not assign enough staff resources to the relationship with ECA; Precimed did not generate as many sales for ECA as it would have if it had given the relationship the

required priority; and thus Precimed did not fulfill its obligations under the Agreement. "Having directly breached the [Agreement], [Precimed] cannot be held simultaneously liable for tortiously interfering with that same [Agreement]." *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013). Given that Delaware law forces ECA to choose between breach of contract and tortious interference, and given that Precimed has not challenged the first counterclaim, the Court assumes that ECA would choose to maintain a theory of breach of contract and thus recommends granting Precimed's motion with respect to the third counterclaim.

### 2. *Fourth Counterclaim: Unfair Competition*

ECA's fourth counterclaim borrows language from the third counterclaim and rests on the same facts. In the fourth counterclaim, ECA states that it "had a reasonable expectation of entering into a valid relationships with numerous orthopedic manufacturers with several of the top orthopedics manufacturers." (Dkt. No. 11 at 25.) Precimed ruined opportunities for sales with those manufacturers "by promoting and selling its own products instead." (*Id.*) As with the third counterclaim, Precimed's "technically and commercially incompetent sales force damaged ECA Medical's pre-existing opportunities to sell to these four OEMs." (*Id.* at 26.) Precimed wants this counterclaim dismissed on the grounds that it duplicates ECA's claims that Precimed breached a comprehensive Agreement that outlined each side's responsibilities. ECA again equates

Precimed's argument about the comprehensive nature of the Agreement with the argument about custom products and argues that there is no duplication because custom products are not part of the Agreement.  ECA concludes that it has pled the necessary elements for a claim for unfair competition.  As with the tortious-interference counterclaim, the most important aspect of the unfair-competition claim is that the alleged unfair competition and squandering of business opportunities is the same conduct that underlies ECA's counterclaim for breach of contract.

The standard for assessing claims of unfair competition under Delaware law has taken time to develop.  "Deceptive conduct constituting unreasonable interference with another's promotion and conduct of business is part of a heterogeneous collection of legal wrongs known as 'unfair trade practices.'  This type of conduct is notoriously undefined.  Commonly referred to as 'unfair competition,' its metes and bounds have not been charted.  The tort action for deceptive trade practices or 'passing off' developed from the common-law action for trademark infringement.  It embraced imitation of fanciful and coined marks and names as well as trademarks.  The action was historically available whenever one trader diverted patronage from a rival by falsely representing that his goods were the goods of his rival."  *State ex rel. Brady v. Wellington Homes, Inc.*, No. 99C-09-168-JTV, 2003 WL 22048231, at *1 (Del. Super. Ct. Aug. 20, 2003).  More concrete elements of an unfair-competition emerged over time.

38

"The elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057–58 (Del. Super. Ct. 2001) (internal quotation marks and citation omitted).

Here, the overlap between the alleged unfair conduct and the conduct alleged breaching of the Agreement creates a problem for ECA.  ECA has pled a reasonable expectancy of sales with various orthopedic manufacturers and has pled that Precimed interfered with that expectancy.  The problem lies in that Precimed is the other party to the Agreement and that the alleged interference breaches its obligations under Article 6 of the Agreement.  Among other information, Section 6.1 requires Precimed to "use reasonable commercial efforts to promote, distribute, market and advertise, and sell" ECA's products; that section also requires Precimed to "provide reasonably timely and professional service to its customers" with respect to ECA's products.  Section 6.2 requires Precimed to "maintain, at its sole expense, a sufficient number of its own sales and service personnel who have adequate experience and ability" to fulfill Precimed's obligations.  These sections are consistent with the third introductory paragraph of the Agreement, which states that Precimed "has represented and warranted to [ECA] that it possesses the necessary technical and commercial

39

competence and the ability to easily structure the organization necessary to ensure efficient performance of its contractual obligations."  Article 6 of the Agreement is sufficiently explicit that the Court sees no way by which Precimed could have stolen sales opportunities and ruined relationships with incompetent staff without violating that article.  A successful claim for breach of contract, therefore, would provide ECA with all of the relief that it could pursue under an unfair-competition claim, and without the oddity of a party to a contract seeking common-law relief for a violation of that contract.  *Cf. EDIX Media Group, Inc. v. Mahani*, No. Civ.A. 2186-N, 2006 WL 3742595, at *11 (Del. Ch. Dec. 12, 2006) ("Unfair competition affords plaintiff no relief at common law from breaches of confidentiality that its claim in contract does not.  Nor does it expand upon damages derived from the non-competition agreement: if defendant's post-employment activities do not breach his contractual duties, they are not in some other way wrongful.  No additional damages may stem from this Count.").  To avoid needless duplication, the Court recommends granting Precimed's motion to dismiss the fourth counterclaim.

3.   *Fifth Counterclaim: Breach of Implied Covenant of Good Faith and Fair Dealing*

ECA's fifth counterclaim rests on the same factual allegations that it has made generally in the case and specifically for its other counterclaims.  In fact, ECA confirms the factual similarity explicitly, claiming that Precimed's "conduct

described in these counter-claims breached the implied covenant of good faith and fair dealing in the Agreement." (Dkt. No. 11 at 26.) ECA then elaborates a little by claiming that Precimed's "account management, technical, and commercial incompetence in selling ECA products constituted unreasonable conduct" (*id.*) and that Precimed's rejection of sales assistance from ECA "subverted the fundamental purpose of the Agreement—for [Precimed] to sell ECA products." (*Id.* at 27.) Because "the Parties anticipated that [Precimed] would develop opportunities to sell semi-custom and custom products in good faith" (*id.*) and because Precimed failed to do so, ECA allegedly did not receive the benefit of entering the Agreement. Precimed wants this counterclaim dismissed because the Agreement already contains provisions governing the reasonable efforts that it had to make under the Agreement to sell ECA's products. According to Precimed, if the Agreement contains provisions requiring reasonable sales efforts and minimum sales and technical competence then ECA's concerns fall under its counterclaim for breach of contract, and a tort-based claim pertaining to implied covenants is unnecessarily duplicative. ECA counters that it properly has pled the elements of a claim for breach of implied covenants, arguing that "while the Agreement did not provide for terms governing the sale of semi-custom and custom products, in the spirit of the Agreement, an implied covenant existed that Greatbatch would not engage in unreasonable conduct preventing ECA's sale of such products, reasonably cooperate with ECA

to sell such products, and would develop any opportunities to sell such products in good faith."  (Dkt. No. 20 at 14.)

The problem with ECA's argument is that it does not identify an obligation not already covered by the express terms of the Agreement and that must be inferred from the Agreement.  "The implied covenant of good faith and fair dealing inheres in every contract and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.  The implied covenant cannot be invoked to override the express terms of the contract. Moreover, rather than constituting a free floating duty imposed on a contracting party, the implied covenant can only be used conservatively to ensure the parties' reasonable expectations are fulfilled.  Thus, to state a claim for breach of the implied covenant, [plaintiff] must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff. General allegations of bad faith conduct are not sufficient.  Rather, the plaintiff must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff the fruits of the contract.  Consistent with its narrow purpose, the implied covenant is only rarely invoked successfully." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (internal quotation marks and citations omitted).  Again, the Agreement contains an entire article, Article 6, that sets forth Precimed's responsibilities as a distributor.

42

Section 6.1 requires Precimed to "use reasonable commercial efforts to promote, distribute, market and advertise, and sell" ECA's products; that section also requires Precimed to "provide reasonably timely and professional service to its customers" with respect to ECA's products. Section 6.2 requires Precimed to "maintain, at its sole expense, a sufficient number of its own sales and service personnel who have adequate experience and ability" to fulfill Precimed's obligations. These sections are consistent with the third introductory paragraph of the Agreement, which states that Precimed "has represented and warranted to [ECA] that it possesses the necessary technical and commercial competence and the ability to easily structure the organization necessary to ensure efficient performance of its contractual obligations." Together, these provisions from the Agreement explicitly address every concern that ECA has about Precimed putting its own interests above ECA's and about incompetent Precimed sales staff ruining ECA's relationships with its house accounts. *Cf. Overdrive, Inc. v. Baker & Taylor, Inc.*, Civil Action No. 5835–CC, 2011 WL 2448209, at *8 (Del. Ch. June 17, 2011) ("The problem with plaintiff's claim, however, is that this alleged implied contractual obligation comes straight from the Agreement itself. Delaware courts will not imply a covenant where the contract addresses the subject of the alleged wrong, but fails to include the obligation alleged.") (internal quotation marks and citation omitted). Holding Precimed accountable for any lapses in sales efforts and in technical and commercial competence will not require inferring any

43

obligation that lies beyond the express language of the Agreement.  Precimed thus is correct that ECA's fifth counterclaim is duplicative, and the Court recommends granting Precimed's motion to dismiss it.

4.   *Sixth Counterclaim: Promissory Estoppel*

The last counterclaim that the Court will review for possible dismissal is ECA's sixth counterclaim for promissory estoppel.  In this counterclaim, ECA states that Precimed "made promises to market, sell, and manage accounts for ECA products in a competent manner."  (Dkt. No. 11 at 27.)  ECA allegedly relied on these promises to its detriment, costing it sales that it would have made with a competent partner, whether Precimed or someone else.  Precimed wants this counterclaim dismissed on the basis that the doctrine of promissory estoppel is not available for promises covered by a valid and enforceable contract.  ECA's response is somewhat confusing.  Although the counterclaim as pled makes no distinction between standard and custom products, ECA's motion papers argue that "[b]ecause custom products are not part of the Agreement, any promises made by [Precimed] to sell such products in cooperation with ECA are subject to ECA's claim for promissory estoppel.  Indeed, as ECA alleges, [Precimed] made promises to market and sell semi-custom and custom products in a commercially reasonable manner."  (Dkt. No. 20 at 15.)

As a preliminary matter, ECA cannot play both sides of the custom-products issue.  At every other point of the pending motions, ECA argued

consistently that Section 2.1 of the Agreement, which defines the term Products,

does not include custom products, and that the Agreement briefly acknowledges

the existence of custom products while leaving the parties to negotiate separate

terms for them.  ECA also has denied any course of performance with Precimed

regarding custom products that would either interpret or reform Section 2.1 to

include them.  Now, for the sole point of arguing for promissory estoppel, ECA

pivots and argues not only that Precimed made promises to sell custom products

but that it relied on Precimed's promises and expected that Precimed would sell

custom products.  ECA, however, has not identified by what authority Precimed

would do more than relay requests for custom products and actively try to sell

them.  Worse yet, the assertion of reliance on a promise to sell custom products

directly contradicts paragraph 17 of the counterclaims, which states the following:

> Under paragraph 2.1, the Products for which [Precimed] had the right
> to act as the exclusive distributor included only those specific
> products that are set forth on Exhibit A.  Exhibit A includes only
> specifically identified standard products and does not include any
> semicustom or custom products.  Therefore, Greatbatch had the
> right to act as the exclusive distributor only for the specific standard
> products listed on Exhibit A, not for semi-custom or custom products.

(Dkt. No. 11 at 14.)  Paragraph 19 further states that the parties only

"contemplated" that Precimed "might" bring opportunities for custom products to

ECA's attention.  This irreconcilable factual contradiction cannot stand; ECA

cannot reasonably claim detrimental reliance on a casual contemplation of

custom-product sales that might happen.  The Court under Rule 12 will accept a

wide variety of assertions at face value; "conclusory allegations need not be

credited, however, when they are belied by more specific allegations of the

complaint."  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995)

(citations omitted); *see also In re Livent, Inc. Noteholders Secs. Litig.*, 151 F.

Supp. 2d 371, 405–06 (S.D.N.Y. 2001) ("Thus, a court need not feel constrained

to accept as truth conflicting pleadings that make no sense, or that would render

a claim incoherent, or that are contradicted either by statements in the complaint

itself or by documents upon which its pleadings rely, or by facts of which the court

may take judicial notice.") (citations omitted).  ECA's factual inconsistencies

within its own counterclaims alone would suffice to recommend dismissing the

counterclaim for promissory estoppel.

Even aside from the problem of factual inconsistency, the counterclaim for

promissory estoppel runs into the same problem that the previously discussed

counterclaims did, namely that the promises that Precimed allegedly made and

did not fulfill—for standard products, anyway—appear expressly in the

Agreement.  "The doctrine of promissory estoppel is an equitable remedy

designed to enforce a contract in the interest of justice where some contract

formation problem would otherwise prevent enforcement.  In other words,

promissory estoppel is generally viewed as a consideration substitute for

promises which are reasonably relied upon, but which would otherwise not be

enforceable.  Hence, a party cannot assert a promissory estoppel claim based on promises that contradict the terms of a valid, enforceable contract." *Weiss v. Nw. Broad. Inc.*, 140 F. Supp. 2d 336, 344–45 (D. Del. 2001) (internal quotation marks and citations omitted); *accord J.C. Trading Ltd. v. Wal-Mart Stores, Inc.*, 947 F. Supp. 2d 449, 457–58 (D. Del. 2013).  As the Court pointed out above for the other counterclaims that Precimed challenged, the introduction to the Agreement and much of Article 6 contain explicit promises by Precimed that it would use experienced and competent sales staff to bring sales opportunities to ECA. Those explicit promises almost certainly induced reliance by ECA in the form of turning over house accounts, as ECA has pled.  Because the promises, however, appear in the express language of the Agreement, ECA's counterclaim for breach of contract will cover any damages that ECA wants to assert as a consequence of any alleged broken promises.  *Cf. SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 348 (Del. Supr. Ct. 2013) ("The promise to negotiate in good faith for a definitive license agreement . . . is expressly included in both the Bridge Loan and Merger Agreements.  Therefore, a claim based on promissory estoppel cannot lie and a Vice Chancellor must look to the contract as the source of a remedy on the breach of an obligation to negotiate in good faith.").  An equitable remedy outside the Agreement will not serve the interest of justice beyond what the counterclaim for breach of contract can do.  As a result, the counterclaim for promissory estoppel is needlessly duplicative of the counterclaim for breach of contract, and

47

the Court recommends granting Precimed's motion to dismiss it.

### C.   *Motion to Strike Language*

Finally, the Court will assess Precimed's motion under Rule 12(f) to strike language from ECA's counterclaims.  Precimed's argument in its motion papers runs only one page and appears to limit itself to four specific points worth of allegations, reprinted here verbatim:

> 1.   "Greatbatch's financial troubles" (Counterclaim ¶¶ 20-25).
> 2.   Greatbatch Medical has mislead [sic] the public on its financial performance (*id.* ¶¶ 21-22).
> 3.   Greatbatch Medical has been sued by Zimmer for "millions of dollars in lost sales" on account of manufacturing changes (*id.* ¶¶ 25, 28).
> 4.   Greatbatch Medical has "engaged in such predatory behavior before—holding Medical Research Products A, Inc. ('MRPA') 'hostage' in an attempt to coerce MRPA to agree to unreasonable and exorbitant terms . . ." and MRPA then sued Greatbatch Medical (*id.* ¶ 44).

(Dkt. No. 16-1 at 11.)  Precimed wants these allegations stricken as irrelevant to any issues in the case and as "designed to inflame readers such as the jury and anyone in the marketplace who picks up ECA Medical's pleading."  (*Id.*)  ECA counters that these allegations are relevant because they "speak directly to Greatbatch's intent and motive for distorting the Agreement and attempting to harm ECA's success in that sector.  As Greatbatch's own orthopedic business slid into disarray, it had a greater incentive to wrongly extract as much from the Agreement as possible and to exploit ECA's products for Greatbatch's own strategic advantage."  (Dkt. No. 20 at 16.)  ECA also asserts that the information

forming the basis of the allegations came from publicly available information, meaning that Precimed cannot claim prejudice in the marketplace.

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FRCP 12(f). "In deciding whether to strike a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible. The Federal Rules of Civil Procedure have long departed from the era when lawyers were bedeviled by intricate pleading rules and when lawsuits were won or lost on the pleadings alone. Thus the courts should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (citations omitted). More specific criteria have emerged for evaluating a Rule 12(f) motion. "To prevail in such a motion, [moving parties] must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001) (internal quotation marks and citation omitted). "Whether to grant such motion, however, is within the district court's discretion." *Holmes v. Fischer*, 764 F. Supp. 2d 523, 532 (W.D.N.Y. 2011) (Skretny, *C.J.*) (citation omitted).

49

Here, Precimed's request to strike runs into several difficulties.  First, Precimed partially has overstated the supposedly inflammatory nature of the allegations in question. Precimed is correct that part of ECA's counterclaim bears the subheading, "Greatbatch's Financial Troubles," but the paragraphs under that subheading state simply that Precimed's "economic reality, however, has been quite different than portrayed by Greatbatch's rosy public statements."  (Dkt. No. 11 at 15.)  The remaining paragraphs under the subheading mention Precimed factories that closed, cite a Precimed press release, and then mention the *Zimmer* litigation from Indiana.  The substantive information from those paragraphs puts the subheading in context, and Precimed's failure to include that context in its motion papers is misleading.  Similarly, Precimed's second point in its motion to strike also lacks context.  ECA never said in its counterclaims that Precimed "misled the public," which would come closer to alleging fraud than what ECA actually said—that Precimed closed factories in July 2012, that Precimed blamed the closings on difficulties in the orthopedics market, that another manufacturer brought litigation in response to the closings, and that this information together suggested a different "economic reality" than what appeared in Precimed's public statements.  Regardless of the relevance or inflammatory nature of ECA's allegations, which the Court will address below, Precimed's exaggeration of ECA's allegations has not helped the Court to assess the motion.

Second, Precimed has blurred the pretrial standard of relevance with the

trial standard for admissibility. ECA alleges that Precimed breached the

Agreement and started pushing to include custom products in the Agreement for

financial reasons. According to ECA, Precimed wanted to boost sales of its own

products by exploiting ECA's house accounts and wanted the same commissions

for custom products that it would receive for standard products. Precimed's

motives supposedly led to the breach of comprehensive yet somewhat subjective

obligations in the Agreement to "use reasonable commercial efforts" to sell ECA's

products and to manage ECA's house accounts with adequate experience,

ability, and competence.[3] If exploring Precimed's alleged motives leads to

deposition testimony or documentary evidence that confirms an intent or a plan to

mistreat ECA then ECA would be justified in pursuing that theory of liability. The

pretrial standard for discoverable evidence is broad enough to allow ECA to

pursue its theory of liability. In contrast, the outcome of discovery might make

admission of the counterclaims into evidence at trial more problematic, but the

trial judge can address that problem separately from what this Court needs to

address now. *See Lipsky*, 551 F.2d at 893 ("Evidentiary questions, such as the

---

[3] The subjective nature of Precimed's obligations to use reasonable commercial efforts with adequate experience, ability, and competence is the factor that allows ECA to explore potential motive and intent. "The motive for the breach commonly is immaterial in an action on the contract." *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 547 (1903) (citations omitted). Here, though, the express terms of the Agreement allow for allegations that bad faith and bad motives infected Precimed's staffing and customer-relations decisions, which in turn could have led to breaches of various obligations in various ways that would affect damages.

one present in this case, should especially be avoided at such a preliminary stage of the proceedings.  Usually the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial in which to be properly decided.  And ordinarily neither a district court nor an appellate court should decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone.") (citations omitted).  At any eventual trial, ECA would have to prove that its pleading in itself is relevant in a way that requires publication to the jury.  *See Federated Dep't Stores, Inc. v. Grinnell Corp.*, 287 F. Supp. 744, 748 (S.D.N.Y. 1968) ("The principal prejudice urged is that which may be suffered if the jury sees the complaints in these cases.  However, such is not the practice in this District.  Moreover, this possibility can certainly be met by pretrial order or stipulation.") (citation omitted); *Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp.*, 2 F.R.D. 305, 306 (S.D.N.Y. 1942) ("If the trial court feels they are prejudicial, it can direct that they be not read to the jury.  The pleadings are not evidence.") (citation omitted).  Even if the trial judge admitted the counterclaims into evidence, he would have discretion to redact them as needed based on the totality of the circumstances before him at that time.  *Cf. Chisholm v. Sloan-Kettering*, No. 09 Civ. 8211(VM), 2011 WL 2015526, at *3 (S.D.N.Y. May 13, 2011) (admitting the pleadings into evidence at trial but redacting them to exclude claims not presented to the jury).

Third, the allegations from ECA that Precimed is attacking rest at least in part on public information and simply are not impertinent or scandalous enough to warrant deletion.  "Scandalous generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court."  *Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 416 (S.D.N.Y. 2012) (internal quotation marks and citation omitted).  Precimed may not be happy that ECA has chosen to interpret factory closings, press releases, and prior litigation in a particular way.  Precimed has not denied, however, that it did close certain factories in July 2012, that it did issue press releases about those closings, and that other companies named it in prior litigation.  All of that information is publicly available, and opinions based on it would have to be significantly inflammatory to match the kinds of comments that courts have stricken as superfluous.  *Cf., e.g., Alvarado-Morales v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988) ("Counsel for appellants does, however, defend his use of such terms [for an employee severance plan ] as 'concentration camp,' 'brainwash' and 'torture' and such similes as 'Chinese communists in Korea,' as accurate renderings of his clients' description of their experiences.  No matter the origin of these repugnant words replete with tragic historical connotations, they are superfluous descriptions and not substantive elements of the cause of action.  As such, they have no place in pleadings before the court."); *Gateway Bottling, Inc. v. Dad's*

*Rootbeer Co.*, 53 F.R.D. 585, 588 (W.D. Pa. 1971) (denying a motion to strike an affirmative defense that a plaintiff suing for wrongful termination of a bottling franchise pled guilty to an attempt to burn down the bottling plant; "[t]he facts here may be unpleasant for plaintiff to have on the record and they certainly contain charges of reprehensible conduct but the same is true of many facts of life which are entitled to be pleaded as relevant to a cause of action or a defense.").  ECA's concealment of the short-lived nature of Precimed's prior litigation was suspicious; its argument that the filing of the prior litigation in itself proves anything was silly.  Nonetheless, and as noted above, the pretrial discovery process is broad enough to make the parties' current situation simple.  ECA has taken its dealings with Precimed and combined them with publicly available information to form a theory of liability that explains an alleged breach of contract as a motive for financial gain in conformity with prior habits.  Subject to the usual restrictions on abusive discovery tactics, ECA should have room to pursue its theory just as Precimed should have room to pursue its own theories.

For the above reasons, therefore, the Court recommends denying Precimed's motion to strike, but without prejudice to address redaction of ECA's pleadings should those pleadings enter into evidence at trial.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends adjudicating Precimed's consolidated motions (Dkt. No. 16) as follows: 1) denying

54

Precimed's motion for declaratory judgment; 2) granting Precimed's motion to dismiss ECA's third through sixth counterclaims; and 3) denying without prejudice Precimed's motion to strike.

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

_/s/ Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: January 28, 2014